UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ENTRAL GROUP INTERNATIONAL, LLC, )
)
Plaintiff, )
)
vs. ) CV-05-1912
)
YHCL VISION CORP., and JEFF )
CHEN, )
)
Defendants. )
---------------------------------)

(CONTAINS ATTORNEY'S EYES ONLY PORTIONS)

VIDEOTAPED DEPOSITION OF RAY YIM
New York, New York
Tuesday, May 23, 2006

Reported by:
Philip Rizzuti
JOB NO. 7392

Dockets.Justia.com

May 23, 2006
10:02 a.m.

Videotaped deposition of RAY YIM, held at the offices of Alston & Bird, LLP, 90 Park Avenue, New York, New York, pursuant to Notice, before Philip Rizzuti, a Notary Public of the State of New York.

A P P E A R A N C E S:

ALSTON & BIRD, LLP
Attorneys for Plaintiff
90 Park Avenue
New York, New York 10016
BY: ROBERT E. HANLON, ESQ.
BROOK A. CLARK, ESQ.

DAVID J. HOFFMAN, ESQ.
Attorney for Witness
29 Broadway, 27th floor
New York, New York 10006

ALSO PRESENT:
JOSH LIPSON, Videographer
NICHOLAS CHAI,
ZACHARY B. CHAPMAN,

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

Yim

THE VIDEOGRAPHER: This is the start of tape number 1 of the videotape deposition of Ray Yim in the matter of Entral Group International versus YHCL Vision Corp. Today's date is May 23, 2006 at approximately 10:02 a.m.

Will counsel please introduce themselves and who they represent.

MR. HANLON: Robert E. Hanlon of Alston & Bird, LLP, representing Entral Group International, LLC, plaintiff in this matter.

MS. CLARK: Brook Clark also of Alston & Bird also representing plaintiff, Entral Group International.

MR. HOFFMAN: David Hoffman, 29 Broadway, 27th floor, New York, New York, for the witness, Ray Yim and the North American Karaoke Works Trade Association, non-party witness.

MR. HANLON: Also present at this deposition is Nicholas Chai, president of Entral Group International, plaintiff in this matter. And Zach Chapman, an intern

Yim

**Q. How long had you been employed there?**

A. About two or three years, I don't quite remember exactly.

**Q. Before that?**

A. Student.

**Q. Other than your work at Digital Dynasty have you had any employment in the electronics business or related communications business?**

A. Related to telecommunication business?

**Q. Electronics or telecommunications?**

A. No.

**Q. Have you had any employment in the entertainment business, including bars, restaurants, clubs, music settings?**

A. Yes.

**Q. What employment have you had in that business?**

A. Pop Music Studio Incorporated.

**Q. What type of business is Pop Music Studio Incorporated in?**

A. Karaoke bar.

Yim

**Q. Where is that located?**

A. 37-08 Main Street, Flushing, New York 11354.

**Q. For what period were you employed by Pop Music Studio Incorporated?**

A. 2001 to present.

**Q. What is your job at Pop Music Studio Incorporated?**

A. I am the owner.

**Q. Are you the 100 percent owner or are there other people with ownership interest?**

A. Majority.

**Q. Are you also an employee of Pop Music Studio Incorporated?**

A. Yes.

**Q. What are your duties as an employee?**

A. Excuse me?

**Q. What are your duties as an employee?**

A. Watch the business.

**Q. Would you say you are the manager of the business?**

**Yim**

A. I don't manage the place, I just watch the business. I mean how can I explain. I would say I am the owner would be better, if I don't physically operate the place.

**Q. Well, an owner doesn't necessarily have to watch a business or appear at the business and take any active role, and an owner doesn't have to be employed by the business. He doesn't have to be -- he doesn't have to take a salary and have duties?**

A. I watch the money.

**Q. Do you regularly appear at that business, at the location?**

A. No, not really.

**Q. How often do you visit Pop Music Studio?**

A. A few hours a week.

**Q. Are you very familiar with the operation of a karaoke bar?**

A. Okay, moderate.

**Q. So you generally know how a karaoke bar operates?**

A. To a specific, not really.

**Q. You don't know how it operates?**

**Yim**

A. That is why my answer is moderate.

**Q. Well, tell me what you do know about a karaoke bar's operation?**

A. On a business wise, yes, I know how to run the business. But the entertainment part, I am not quite familiar with entertainment, how to entertain the customer.

**Q. Who are the other owners of Pop Music Studio Incorporated?**

MR. HOFFMAN: Why do you need to know that?

MR. HANLON: Excuse me?

MR. HOFFMAN: Why do you need to know that?

MR. HANLON: I need to know that, who the other owners are.

MR. HOFFMAN: No, I instruct him not to answer.

MR. HANLON: On what basis?

MR. HOFFMAN: What does that have to do with this case?

MR. HANLON: This individual has a relationship between himself, a karaoke

Yim

discussed, we have not yet reached a resolution, and rather than asking the court to come back on the line later, I would like to see --

JUDGE MANN: Well, I am not on retainer to you folks, so I am not going to be taking all of your calls, I will tell you that right now.

MR. HANLON: I understand, that is why I am trying to resolve it now, it is very short. The song list that was provided by Mr. Yim and the Trade Association was originally marked attorney's eyes only. This song list is a list of songs that can be seen by any member of the public who walks into the karaoke club and looks at the menus that are offered.

It has been marked as attorney's eyes only. We have asked Mr. Yim and his counsel to remove that designation. To date they have refused to do so.

JUDGE MANN: Well, I am not prepared to rule on that now. We had a

Yim

discussion about this. There is a transcript of the prior proceeding, and the confidentiality agreement provides for the procedure to challenge designations.

MR. HANLON: Your Honor, Mr. Hoffman has continued to refuse to sign the confidentiality agreement.

MR. HOFFMAN: They took my name off of it.

JUDGE MANN: The confidentiality agreement is in place whether he signs it or not. But I am not prepared on this phone call to resolve that dispute.

MR. HANLON: Very good.

MR. HOFFMAN: Fine.

JUDGE MANN: Thank you.

(Telephonic conference concluded.)

**Q. Can you go back and find the question. Would you please read back the question to Mr. Yim.**

**(Record read)**

A. The original MTV karaoke work.

**Q. When you say the original MTV**

**Yim**

**karaoke work I don't quite understand. Where did that content come from?**

A. It is originally distributed by EGI which I pay a license for.

**Q. Do you currently have an active license with EGI?**

A. Yes.

**Q. Aside from the content that EGI has given you, is there any other karaoke video content on your system at Pop Music?**

A. No.

**Q. EGI has a process of supplementing, adding to the content that it has given a licensee that is done on a periodic basis in exchange for a separate fee. Other than through that process have you obtained any additional EGI content?**

MR. HOFFMAN: Objection.

A. I refuse to answer.

**Q. You can't refuse to answer the question.**

A. That is not related to those questions you asked me to --

**Q. Sir, the judge has instructed you**

**Yim**

**to answer the questions in this area about the source of your videos. If you don't answer the question we will call the judge back and we will ask her to hold you in contempt?**

A. I already answered you.

**Q. No, you did not answer that question?**

A. All these songs, all the songs that I am using in my karaoke club is distributed from the original company and which I pay a license for.

**Q. Could you read back the question that I asked.**

**(Record read.)**

A. No.

**Q. How is the material that you obtained from EGI stored on your karaoke system?**

A. I am not familiar with how does it work, but I know it is through the computer.

**Q. Do you know whether it is stored on hard drives?**

A. Yes. Hard drives.

**Q. Are those hard drives removable?**

Yim

MR. HANLON: Please go back and read back my statement, this is not really pertinent, but Mr. Hoffman seems determined to have a dialogue about whether my statement had the word all in it or not.

(Record read.)

MR. HANLON: I didn't say the distribution was to all of its members.

MR. HOFFMAN: They distributed it to YHCL, that is what this case is about.

MR. HANLON: We have a right to inquire about --

MR. HOFFMAN: Other places.

MR. HANLON: -- development, production and distribution of any karaoke works by you.

MR. HOFFMAN: Sure.

MR. HANLON: You includes NAKWTA's distribution to other members. Please produce the membership list.

MR. HOFFMAN: Okay, great.

**Q. Do you know the twelve, can you name the twelve members; do you know name**

**Yim**

**them?**

A. I can name some of them.

**Q. Please do?**

A. Not all of them.

**Q. Please do?**

A. Black Swan. Galaxy. 100 Fun. Pop Music Studio. UFO. Melody. That is all I can remember right now.

**Q. We still need the list.**

**What number are we up to. Plaintiff's Exhibit 21, press release.**

**(Plaintiff's Exhibit 21, press release, marked for identification, as of this date.)**

MR. HANLON: We will take a break at this point to change the tape.

THE VIDEOGRAPHER: The time is 11:42. We are going off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 11:51. This is the start of tape number 2 of the videotape deposition of Mr. Yim.

MR. HOFFMAN: Just before we go back, I think Mr. Yim wants to clarify

Yim

one of his answers.

A. The one you just mentioned for the membership list, I don't have the physical paper list of the members. But if you ask -- I mean if you have to have -- I do not have physical paper to keep the record of it.

**Q. I understand. There is a procedure for that, Mr. Yim. What we will do is --**

A. Just letting you know.

**Q. I understand. This is how we can solve that.**

A. All right.

**Q. You are going to be given a copy of the deposition to review to insure that the court reporter has properly recorded your answers. What we will do is we will leave -- you gave us I believe a few names, and we will leave a blank in there and you can indicate that there are other names to be filled in. And there is a sheet at the back for correcting or adding information, and you can list the rest of the members in that sheet after you refresh your recollection by looking**

**Yim**

**at whatever material you need to?**

A. Okay.

MR. HOFFMAN: Don't assign homework assignments. Ask questions.

MR. HANLON: Excuse me, he is going to get a homework assignment because he has an obligation under the subpoena to answer it.

**Q. Mr. Yim, how can you determine who those other members are, do you have pieces of paper; I know there is not a list you said, but are there other individual pieces of paper that show who the members are?**

A. No paper, no physical paper. Everything is in the memory.

**Q. We will come back to that a little later.**

A. Okay.

**Q. I have given you Exhibit 21. Can you tell me what this document is?**

A. That is the paper, it is the goal for our association, as well as the document for the press conference to the press.

**Q. Is this the document that you were**

Yim

**looking at earlier that you used to refresh your recollection and I asked for a copy?**

A. That is correct.

**Q. Who prepared this document?**

A. You mean physically write down or a discussion for the goal?

**Q. Who was involved in discussing this, to come up with this paper?**

A. All the members. All the members.

**Q. Who actually wrote it out?**

A. Sam, Sam Chan.

**Q. Are you familiar with the contents of this press release?**

A. Quite familiar.

**Q. I would like to look at the heading -- withdrawn, start again.**

**Do you see the second paragraph that begins the North American Karaoke Works Trade Association is a not-for-profit organization. The purposes for NAKWTA is to, and then there is a list of purposes?**

A. Yes.

**Q. I would like to look at purpose D: To provide free resources and supports to**

Yim

**members of the karaoke business or industry.**

**What types of free resources does the Trade Association provide?**

A. Where to get the liquor license and if they need a lawyer for the violation, and that is what is all being discussed.

**Q. When you say where to get a liquor license, you provide information about --**

A. The web-site and what kind of document they need. There are several members, they may not know English, so that kind of document is helpful for them.

**Q. When you say a lawyer, does the association provide a lawyer, or do you give them information about lawyers?**

A. The association will not give the lawyer, we just providing some assistance to members. They are using certain lawyers to apply the liquor license, they feel it is good, it is kind of like a referral.

**Q. So you provide most of the information?**

A. Excuse me.

**Q. Most of the information?**

Yim

A. Ah-ha.

**Q. Any other free resources that the association provides?**

A. We provide the song as well.

**Q. When you say you provide the song, what does that mean?**

A. We provide the songs which give those members alternative way for those members who cannot afford the original MTV karaoke.

**Q. Let's back up a little bit. You have used the phrase MTV karaoke. Can you explain what you -- when you say karaoke MTV, what do you mean?**

A. Which people can use the music video to sing a song in their club.

**Q. Can you explain what a MTV karaoke music video is like?**

A. It is like a motion picture, plus the music background so you can go by the rhythm and to sing a song.

**Q. On this MTV karaoke video, do they usually have the original artists displayed in the video?**

Yim

A. Original artists means?

**Q. The well known --**

A. The singer?

**Q. Yes.**

A. May not.

**Q. Do some of them have the singer?**

A. Yes.

**Q. And do some of them have other scenes --**

A. Actor, yes.

**Q. So when you say -- you call it a MTV video because it is like --**

A. I mean original MTV, which some -- basically it is distributed by the record company which Entral Group -- I mean -- you probably know what kind of detail about the Entral group's work. I am trying to explain.

**Q. When you say MTV video, you don't mean it comes from the television station MTV, you mean it is that type of video?**

A. They might.

**Q. They might be on MTV?**

A. Correct.

**Q. But they are not all on MTV?**

Yim

**Q. Guong Zhou?**

A. Yes.

**Q. That is in PRC?**

A. Yes.

**Q. Did you ever meet him anywhere other than in Guong Zhou?**

A. No.

**Q. You had talked about going to China and I am not sure if it was Hong Kong or PRC, in June of 2005. Is that when you met Mr. Cheng?**

A. Yes, the first time.

**Q. And when you met him the first time what happened?**

A. Basically when we were here in, before I, before I take a trip to China, to Hong Kong, and we were looking for people who can create this kind of work. So we asked people -- we asked friend's friends to look for us. And then he came up with a person. So I flew to Hong Kong and into China to meet this person. That is how I met him.

**Q. Who referred you to Mr. Cheng?**

A. A friend's friend.

Yim

**Q. What was the name of the person?**

A. I don't remember.

**Q. Was it someone in the karaoke business?**

A. No, it is people in Hong Kong.

**Q. Who was the friend who connected you to that friend?**

A. One of the previous member.

**Q. Who was that?**

A. I don't remember his name. He joined the club and he closed the business.

**Q. What club was that?**

A. I forget the name also. But if -- let me see if I can possibly to take out the karaoke bar's name.

**Q. We will leave a blank in the transcript for you to fill that in.**

TO BE FURNISHED: ____________________

____________________

**Q. When did you first contact -- did you contact Mr. Cheng before you went to Guong Zhou?**

A. No. It is someone -- it is people in Hong Kong who contacted for me.

Yim

**Q. Who in Hong Kong contacted him?**

A. The friend of the previous members friend.

**Q. Do you have any information that would give you the name of the person in Hong Kong?**

A. I believe I don't have it. The thing is if I dig out the information of the previous member, I might possibly to get information.

**Q. You said that you then went to Guong Zhou to meet with Mr. Cheng?**

A. Yes.

**Q. What happened then?**

A. Then I asked him if he can do this kind of things, and he said yes. But I said -- but only problem he has, he know how to do it, but he needs the equipment. I said what kind of equipment do you need. He said he needs the computer. I said oh, I said all right. So I called back here and to discuss with Sam to see -- I tell him the story. And he spoke to the members about the equipment they are looking for.

Yim

So at the end they find somebody in Hong Kong who is willing to give the computer, which is like a used one, so they give it to the club. So I give it to them for them to use it, and then they see the unit, they say it is usable.

**Q. When you met with Mr. Cheng, where did you meet with him?**

A. In the restaurant.

**Q. Did Mr. Cheng have an office or place of business?**

A. No. I believe he doesn't have it. He never mentioned his company or stuff like that. I asked him what kind of things he can do, and he told me roughly what he is going to do. So I said, you know, let's try.

**Q. Who in Hong Kong gave you the computer?**

A. It is one of the members also of the -- also one of the friends of the members.

**Q. Who is that?**

A. I don't remember exactly the name.

**Q. Which member?**

A. I think I have to ask Sam, because

Yim

A. I never mentioned how many. I said do whatever you can, I need the work.

**Q. Well, did you give him any idea about how many?**

A. No.

**Q. So how many did he actually produce?**

A. So far?

**Q. Yes.**

A. Approximately 8,000.

**Q. 8,000?**

A. Yes.

**Q. How did he know that you wanted up to 8,000; why didn't he just make a hundred?**

MR. HOFFMAN: Objection.

A. My lawyer object.

**Q. You can answer.**

MR. HOFFMAN: Just answer to your own knowledge.

A. I just asked him to do it. I didn't ask him to make how many or -- he just make -- he wants to make.

**Q. Did you tell him to make as many as he could?**

Yim

A. I didn't mention it actually. I said can you make it, so he made it.

**Q. Mr. Yim, I am puzzled. I guess my reaction is you told Mr. Cheng you wanted him to create some karaoke works, but you gave him no sense of how many at all?**

A. I asked him to make --

**Q. You are saying it, what does it mean?**

A. My conversation is can you make it. But the it to me is the karaoke.

**Q. How much?**

A. To him is karaoke.

**Q. How much?**

A. I said can you make it for me, he said no problem. We never mentioned how many, how much, never. So he just make, he just keep making it.

**Q. How much did you agree you were going to pay him for the karaoke?**

MR. HOFFMAN: Objection.

A. There is no money involved.

**Q. You didn't pay Mr. Cheng anything?**

A. No. I said can you -- they have a

Yim

skill to do it. But they just need the machine to do it. I said you know what, I will give you the machine, can you make it for me. He said okay. What is that called, barter service.

**Q. Barter?**

A. Barter service.

**Q. You gave him the computer and in exchange for the computer --**

A. Exchange the work.

**Q. Let's try again. You asked Mr. Cheng to create karaoke works for you?**

A. Uh-hum.

**Q. To find musicians, to find singers. To have them perform, to record these performances?**

A. Uh-hum.

**Q. To create some kind of video?**

A. Uh-hum.

**Q. And create a text of lyrics on the screen and put all this together?**

A. Right, ah-ha.

**Q. And to create a lot of it, create thousands of works?**

Yim

A. Basically the time when we talked, I said the work, after you create it, right, you can use your own. You just give it to me to use it, and if you want it for your own purpose or if you want to sell it, it is up to you. That is the things we have.

**Q. So you asked him to create this and to give you a copy?**

A. Correct.

**Q. And you didn't tell him how many works, you didn't give him any idea at all?**

A. I said you make it, give it to me. I am assuming that they are using this to do business in China, but I don't know.

**Q. Do you think there was an understanding between you and Mr. Cheng that you needed many thousands of karaoke works?**

A. You mean how many songs?

**Q. Yes.**

A. Probably he just make as many as he can. I said when you make it just send it over to me, that is what I told him. So at the end of the last year Sam Chan went to Hong Kong to pick it up. Then he has this many

Yim

songs in the hard drive already.

**Q. So Mr. Cheng took on this project, he made all these songs and videos, and he gave them to you, and when he -- did he give you periodic reports as to his progress?**

A. No.

**Q. So you spoke to him in July and you told him to go ahead, and then you didn't speak to him again until when?**

A. Probably October or November, but I am not quite remembering. I told him, maybe a person called Sam Chan will come to Hong Kong. I said can you give him all the hard drives. He gave it and he picked it up. But anyway we paid for the hard drive.

**Q. Did you bring blank hard drives or did you give him cash or a check?**

A. We bring the blank hard drives.

**Q. You gave him the physical hard drives and he filled the hard drives?**

A. Yes.

**Q. When did Sam Chan go to Hong Kong to pick these up?**

MR. HOFFMAN: Objection.

Yim

A. December and January of last year to this year.

**Q. When Mr. Chan went over for the first time to pick this up --**

A. He only went once.

**Q. He only went once?**

A. Yes.

**Q. He was given 8,000 songs on hard drives?**

A. Approximately. There is 250 gig of hard drive each, there is four drive, approximately, I don't know the exact count.

**Q. What format of --**

A. I have no idea.

**Q. Sorry.**

A. I have no idea.

**Q. I didn't finish the question --**

A. I don't know the format. Just hard drive.

**Q. Do you know if they were external hard drives or internal hard drives; withdrawn.**

**Did you see the hard drives that -- let me go even further back. Did Sam**

**Yim**

**Chan carry the drives from the U.S. to China or did he buy the hard drives in China?**

MR. HOFFMAN: Objection. Only answer as to your own knowledge.

A. I don't remember. I don't remember if he brought the physical drive over there or if he purchased over there. But as far as I know we gave them hard drives for them to throw in the karaoke work into the hard drive.

**Q. When he brought the hard drives back, when you looked at them, were they external drives or internal drives?**

MR. HOFFMAN: Objection.

A. It is a piece, I don't know.

**Q. External drives are things that sit outside the computer and plug in, and internal drives are put inside the computer. Do you know?**

A. No, I don't know.

**Q. So you said that -- let me see if I get the dates right. You spoke to Mr. Cheng in October or November and he said he had approximately 8,000 works already?**

**Yim**

A. He didn't tell me how many he had. I said somebody is going to come over to pick up the songs, I said do you have it. He said I have it. I said somebody will come over to pick it up. I didn't tell him the exact time because I don't know the -- his schedule. So I said someone will come over to pick it up.

**Q. When you were speaking -- as far as you know did anyone else from the Trade Association ever speak to Mr. Cheng about creating these works?**

A. I told Sam, but I don't know if he has talked to him about the work. But he is the -- Sam is the president of the association, so something I would tell him. I mean not something. Most of the things related to the association I would tell him. I report to him.

**Q. I guess my question wasn't clear.**

**Do you know whether Sam Chan spoke to Mr. Cheng about creating these works?**

A. You mean beside me to ask him to make it --

**Q. Yes.**

Yim

A. If --

**Q. Did Sam ever give him any instruction or direction?**

MR. HOFFMAN: Objection.

A. I don't know.

**Q. As far as you know did anybody else in the Trade Association give him any directions?**

A. No.

**Q. Let's go back to your conversation with Mr. Cheng about the works, did you tell him which works you were interested in?**

A. No.

**Q. Did you tell him whether you were interested in pop music or traditional music?**

A. No.

**Q. Did you tell him whether you were interested in Mandarin or Cantonese?**

A. No.

**Q. The works that you received, are they pop music, traditional music?**

A. Mix. Mix.

**Q. Are they Mandarin or Cantonese?**

A. All mix.

Yim

**Q. Did you tell him which artists you were interested in?**

A. No.

**Q. When you spoke to him in October or November about picking up the work, did you tell him that you wanted -- did he tell you how many works he had done?**

MR. HOFFMAN: Objection.

A. He told me a few thousand, he didn't tell me exactly.

**Q. Did you tell him that you wanted more?**

A. I didn't tell him, I said whatever you have, just give it to me.

**Q. Did you tell him to keep going?**

A. I didn't mention it. I said when you have it. I don't know if he can understand what I am saying.

**Q. Did he tell you that he was going to make more?**

A. He didn't mention that.

**Q. Let's go back to the conversation about using the recordings. What did Mr. Cheng tell you?**

Yim

A. What kind of things, excuse me?

**Q. Earlier you had said that you had a discussion with Mr. Cheng about using the recordings. About using the videos. You said he could use the videos, he could sell them to other people, he could use them. What was that discussion?**

A. No, he said basically -- I give him computer, all right, he said he can do it. Then he said can I use it for myself. I said it is okay, it is your work. So that is what we are talking about.

**Q. So it was your impression that this was Mr. Cheng's work, that he owned this material?**

A. Yes. According to what he said, yes.

**Q. Mr. Cheng was going to give you a copy and let you use it?**

A. Yeah.

**Q. Is there any written agreement between you and Mr. Cheng about these activities?**

A. No.

Yim

**Q. Did you ever send him an E-mail about these activities?**

A. No.

**Q. Did you ever send him any fax or letter or any kind of written communication of any sort asking a question or giving him an instruction about these activities?**

A. No.

**Q. Everything was done either by telephone or in person?**

A. Yes.

**Q. When you gave him the computer, did you give him any paper or did he give you any paper about giving him the computer?**

A. No. It is an old computer, I was thinking it was nothing to lose.

**Q. When Mr. Cheng gave Sam Chan the hard drives, did Mr. Chan -- did Sam Chan give Mr. Cheng any kind of writing or Mr. Cheng give Sam Chan any kind of writing about delivery of these materials?**

MR. HOFFMAN: Objection.

A. I don't know.

**Q. Did you ever see any writing?**

Yim

A. I never seen any writing.

**Q. Did Mr. Cheng ever give you a written license or written permission to use these works?**

A. No.

**Q. What did Mr. Cheng tell you about the rights of the lyricists or the composers concerning the creation of these works?**

MR. HOFFMAN: If any?

A. Can you repeat the question.

**Q. Sure, can you read it back, please.**

**(Record read.)**

A. He didn't tell me anything about the lyricists, composer's rights, but I know the rights.

**Q. What do you know those rights to be?**

A. If you have to play in public, you have to obtain the right. That is what I know.

**Q. How do you obtain those rights?**

A. Through ASCAP.

**Q. Did Mr. Cheng tell you anything**

Yim

**about the publisher's rights about these works in connection with karaoke videos?**

A. Can you repeat, please.

(Record read.)

A. I asked him, okay, that has any right, and he told me they tape themselves.

**Q. They tape --**

A. On all those pictures, they tape themselves.

**Q. What did he tell you about creating karaoke videos from those musical works as far as the rights go?**

MR. HOFFMAN: Wait a minute, what do you mean by that?

**Q. He can answer the question?**

A. I didn't get it.

MR. HOFFMAN: How do you create a video from a musical work, I don't understand the question. If you understand it you can answer it.

A. I don't understand.

**Q. I will try it again.**

**Mr. Cheng took musical compositions, he then arranged to have them**

Yim

**recorded, and then he arranged to combine those musical recordings with video recordings; correct?**

MR. HOFFMAN: Only testify to your own knowledge, but you can answer that.

MR. HANLON: He already testified to that effect, I am trying to review it.

A. I don't know how they make it, but the thing is that is what shows on what they made. It has a picture, it has people singing. So I believe that is what they put them together.

**Q. Let's go back and review just to make sure that we get it right. I think you told me before, correct me if I am wrong, that it is your understanding that Mr. Cheng arranged to have singers perform and arranged to have musicians perform, and Mr. Cheng arranged to have that recorded, the audio portion, the musical portion recorded; is that correct?**

A. I don't know if he does it himself, but he has --

**Q. I understand, I don't know if he**

Yim

**is pushing the buttons on the recorder, I don't care. He arranged it as far as you know?**

A. Yes.

**Q. At your request, you requested him to get this material?**

A. I requested him to do it, but --

**Q. Well, you asked whether he could do it. He said yes, I can do it. You said please go ahead, we would like this stuff, right?**

A. I said show me the sample.

**Q. Right. After he showed you the sample you said please do it and we will take as much as you can do?**

A. I said this is good.

**Q. You asked him to do it and you would take it, right?**

A. Yes.

**Q. You also indicated before, you also said before that you believed that Mr. Cheng created the videos or arranged to have them created, the visual part of this?**

A. Yes.

Yim

THE VIDEOGRAPHER: The time is 2:57. We are back on the record.

MR. HANLON: Could you read back the last question and answer, please.

(Record read.)

**Q. You said that Mr. Sam Chan brought the works back on a hard drive from China; is that correct?**

A. Hong Kong or China. I think it is Hong Kong.

**Q. What happened next?**

A. We bring to the place, we restored the hard drive, and then whoever member wants it, then we made a copy for them.

**Q. Where do you store them?**

A. Where we store?

**Q. Yes.**

A. In Sam's position. So if you want to know where he put it, you can ask him.

**Q. Is there only one set of hard drives that have these works on them?**

A. Yes.

**Q. Where are those hard drives now?**

MR. HOFFMAN: They are in my

Yim

office.

MR. HANLON: I asked the witness.

MR. HOFFMAN: Well, they are in my office.

**Q. Mr. Yim, you can answer the question.**

A. In my attorney's office.

**Q. Have you personally arranged to have any copies of the hard drives made?**

A. I don't really understand the question.

**Q. I will try again.**

**Have you ever taken those hard drives and given them to someone to make a copy?**

A. No.

**Q. As far as you know has Sam Chan ever taken those hard drives and given them to somebody to make a copy?**

A. I don't think so.

**Q. Do you know if anyone else in the Trade Association who has taken those hard drives and given them to someone to make a copy?**

Yim

A. No.

**Q. Do you know if Mr. Cheng has a copy of those hard drives in China?**

A. I am assuming that he has it.

**Q. Has Mr. Cheng, have you spoken to Mr. Cheng since Sam Chan went to China?**

A. After that I don't -- I didn't speak to him, but Sam spoke to him.

**Q. Approximately when was that?**

MR. HOFFMAN: Objection.

A. I don't know.

**Q. Have you communicated with Mr. Cheng in any other way since then?**

A. No.

**Q. We are up to 22, would you mark as Plaintiff's Exhibit 22, list.**

**(Plaintiff's Exhibit 22, list, marked for identification, as of this date.)**

**Q. Mr. Yim, I have just given you a document that has been marked as Plaintiff's Exhibit 22. Can you tell me what this document is?**

MR. HOFFMAN: Can we ask Mr. Chai

Yim

to step out.

MR. HANLON: At this point we are not discussing the content of the document, I am identifying the document without discussing the content. The existence of the document is not privileged.

**Q. I am not asking you to describe in detail the specific contents of the document, but I am asking you --**

A. It is a list.

**Q. What is this song list from?**

A. From Mr. Cheng.

**Q. Does this song list represent a list of songs that Mr. Cheng gave to Sam Chan on the hard drives in December or January?**

A. I never go through the song list, but I know this is a song list. I don't know that this -- all the song list, this -- I don't know if it is the hard drive that we have, if it includes all these songs, I never go through it.

**Q. So what is this a list of?**

A. Excuse me?

Yim

**there?**

MR. HOFFMAN: I think the document speaks for itself.

**Q. What other districts are there; is there a list of districts somewhere?**

A. Excuse me.

**Q. Is there a list of what districts exist on this form; is there any place on the form that shows me what the district number 2 means?**

A. Yes. District number on the first page.

**Q. I see the district number. You said that district number 2 means Queens?**

A. Yes.

MR. HOFFMAN: Right here, there is a --

A. You see this rectangular.

**Q. Yes, okay.**

**Is it limited to these districts or is it --**

A. It is North America. So including the 1 through 5 is in New York, and we also, number 006 is for West Coast and as well as

Yim

007 is for Canada.

**Q. Do you have any members on the West Coast?**

A. No.

**Q. Do you have any members in Canada?**

MR. HOFFMAN: I think he already answered the question.

**Q. You can answer the question?**

MR. HOFFMAN: You asked him --

**Q. You can answer the question. We can argue about whether you answered it or not or we can get through it. Do you have any members in Canada now?**

A. Going to be.

**Q. Not yet.**

MR. HANLON: Mr. Hoffman has asked for a reference to the deposition where the membership fees were discussed. This is the videotape deposition of Shao Feng Li dated Monday, May 22, 2006.

Question -- sorry.

In discussing the North American Karaoke Trade Association the question was:

Yim

"Question: How much was the membership fee going to be?

"Answer: $1,000.

"Question: How often was the $1,000 to be paid?

"Answer: When we entered into the club, we joined the club, the association we paid.

"Question: Was there any subsequent payment that had to be made?

"Answer. No. We also paid a fee of $2,000 later on to this company. Sorry, not this company, correction.

The translator, for the hard drive because all the songs are on the hard drive."

**Q. He then goes on to discuss the $2,000 at length.**

MR. HOFFMAN: Well, that doesn't cover everything on there, but I will let it go.

MR. HANLON: We can give Mr. Chai a copy.

**Q. Mr. Yim, I note that on this**

Yim

**listing it asks for a number of pieces of information about the clubs. It asks the d/b/a name, it asks the trade name. Then it asks individual names. It asked last name and first name, and in this particular case it lists Mr. Jeff Chan.**

**Are individuals considered members or is the club itself considered a member?**

A. The club.

MR. HOFFMAN: Objection.

A. The club. The individuals is only for contact information only.

**Q. Going to page 2, item 1 says: New member fee, basic, U.S. $1,000. Paid only by new members, one time payment.**

**Is there any other membership other than basic?**

A. Membership is only membership. There is no --

**Q. Do you know what the word basic refers to in that line?**

A. It is a basic membership, basic member fee I think.

**Q. Item 2 says donation (a set of**

Yim

**songs). Then it says $500?**

A. Uh-hum.

**Q. Is that a fixed amount or does that change?**

A. It is called donation, you can put any money you want to donate for the association.

**Q. In exchange for that donation what does the member get?**

A. It is not to exchange anything. It is just to donate to the association. Since the association is non-profit organization, so the organization needs the money to operate day-to-day and to -- to begin the business.

**Q. Next to the word donation it says a set of songs, what does that mean?**

A. A set of songs; I am not quite sure, okay. I would say it refers to the songs, the NAKWTA songs.

**Q. If you make a donation you are entitled to get a set of NAKWTA songs?**

A. Not necessarily.

**Q. Then why does the set of songs**

Yim

**appear on the line next to donation?**

A. I think -- I think you have to ask Sam Chan why he put a set of songs next to the donation.

**Q. You don't know?**

A. No.

**Q. Item 3 says membership dues per year, all members, $100. In this case it says zero there. Do you know why it says zero?**

A. Because one year later you pay an annual fee, $100.

**Q. And the zero is there because this is the first application?**

A. Yes, the first year.

**Q. Under that there is a note, what is the purpose of that note?**

A. The purpose that the song, the NAKWTA songs, if they have to use in public, they have to obtain the license from ASCAP. If they use privately they don't have to. If they use -- they want to sing at home they don't have to. But if they use in the public they have to.

Since people in the karaoke

Yim

business, it is used for the public. So we asked them to have to obtain the license from ASCAP.

MR. HANLON: Did we get that transcript back?

MR. HOFFMAN: I never got it.

MR. HANLON: That is right, I read it.

THE VIDEOGRAPHER: The time is 3:45. We are going off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 3:50. This is the start of tape number 4 of the videotape deposition of Mr. Yim.

**Q. Who first contacted someone at Black Swan club about the becoming a member of NAKWTA?**

MR. HOFFMAN: Objection.

**Q. You can answer the question.**

A. I don't know.

**Q. Did you?**

A. No.

**Q. When was Black Swan first contacted?**

Yim

A. I don't know.

MR. HOFFMAN: Objection.

**Q. The date on this application is January 10, 2006. Were they contacted on or about that time?**

MR. HOFFMAN: Objection.

A. No, earlier.

**Q. Approximately when?**

A. I don't remember.

**Q. Weeks earlier, months earlier?**

A. Months. Months.

**Q. What was their reaction when they were contacted?**

A. They are one of the few members that we were -- in the beginning we would talk about first. So that is like March or April of last year, that we already talked about together.

**Q. And why didn't they join back in March or April of last year?**

MR. HOFFMAN: Objection. I think the testimony was that it didn't exist.

A. At the beginning of like March or May, everything is not mature, we are just