# AGREEMENT

**AGREEMENT** (this "Agreement"), dated 1st March, 2003 (the "Effective Date"), between Cinepoly Records Company Limited, a Hong Kong corporation of 8th Floor, 100 Canton Road, Tsimshatsui, Kowloon, Hong Kong (the "Record Company") and TC Worldwide Ltd, a British Virgin Islands corporation of P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands ("TCW").

**WHEREAS:**

TCW intends to establish a comprehensive licensing system in the Territory (as defined below) for coordinating the karaoke networks and/or distributing karaoke version of music videos in the Territory (as defined below) throughout the authorized Outlets (as defined below) therein.

TCW intends to enter into written agreements with the owners and/or operators of the Outlets which allow such Outlets to provide the Licensed Contents (as defined below) to their customers for viewing and singing karaoke via the Karaoke System(s) (as defined below) in the respective Outlets.

TCW thereby desires to enter into an agreement with the Record Company pursuant to which the Record Company shall grant to TCW an exclusive license to use certain karaoke version of the music videos as owned and/or controlled by the Record Company(through its labels as listed out in Exhibit 1) and to collect relevant payments on the terms and conditions of this Agreement.

Certain terms used in this Agreement have the meanings assigned to them in Section 1.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt of which is hereby acknowledged, the Record Company and TCW agree as follows:

1. **DEFINITIONS**

    In the context of this Agreement, the following words have the following meanings:

    (a) "Artist" means a recording artist whose performance is embodied in the recording and featured in the Licensed Content.

    (b) "Back Catalogs" means the multimedia recordings (mainly performed in Mandarin and Cantonese) as owned and/or controlled by the Record Company which have been released for more than three (3) months prior to the Effective Date. A list of Back Catalogs granted as at the Effective Date is attached as <u>Attachment 1</u> hereto.



Dockets.Justia.com

(c) "Control Catalogs" means the sound recordings (mainly performed in Mandarin and Cantonese) as owned and/or controlled by the Record Company which have been released within the three (3) months period prior to the Effective Date or will be released after the Effective Date. A list of Control Catalogs granted as at the Effective Date is attached as <u>Attachment 2</u> hereto.

(d) "Control Catalog Fee" means the license fee as determined and charged by TCW on the Outlets for the grant of right to use the karaoke music video version of the Control Catalog recordings in such Outlets.

(e) "Control Catalog Royalty" means

**REDACTED**

(f) "Control Catalog Revenue" means

**REDACTED**

(g) "Gross Revenue" means all amounts collected by TCW from the Outlets in connection with the existing karaoke usages therein and the sub-license of the rights in the Licensed Contents to such Outlets for Karaoke Performances therein

**REDACTED**

(h) "Karaoke System" means the closed end karaoke system set up and maintained in each Outlet for the purpose of karaoke singing and performances therein.

(i) "Karaoke Performance" means singing and performing the Licensed Contents by the customers of the Outlets therein.

(j) "Licensed Contents" means the karaoke version of the music videos featuring (i) Back Catalogs and (ii) Control Catalogs as owned and/or controlled by the Record Company.

(k) "Net Revenues" means

**REDACTED**

(l) "Other Record Label" means each of the labels listed in the Exhibit 1.

(m) 'Outlet" means a physical commercial premise/venue in the Territory that operates and/or offers karaoke singing services to the public via Karaoke System(s) therein, such as a KTV, a karaoke bar, a pub and a restaurant, as permitted by legal license.

(n) "Term" means the period described in Section 9(a) below and any extension and renewal thereof.

(o) "Territory" means United States of America and Canada only.

2. **SCOPE OF RIGHTS GRANTED**

Upon the terms and conditions set forth in this Agreement, the Record Company grants to TCW, during the Term and in Territory, the exclusive rights as set forth in this Section 2.

(a) The right to reproduce and use or authorize reproduction and usage of the Licensed Contents (and copies thereof) in the Outlets via the Karaoke System therein, including:

(i) the right to reproduce, dub and use and/or authorize reproduction, dubbing and/or usage of the Licensed Contents in such audio-visual physical formats (as ordered from the Record Company and/or manufactured or dubbed pursuant to the approval of the Record Company), including without limitation video cassettes, VCDs, DVDs and/or LDs, through the audio-visual equipments set-up in the Outlets for Karaoke Performances therein; and

(ii) where technically feasible and available, the right to authorize encoding and inclusion of the Licensed Contents in the computerized Karaoke System in the Outlets (if necessary) and the right to allow transmission of the Licensed Contents to the boxes/screens/television-sets connected to such system in the Outlets for Karaoke Performances therein ; in sum, the Record Company grants to TCW exclusively the right to publicly perform, display, copy, reproduce (including switching media [i.e. copying information from a disc to a hard drive]), synchronize, and commercially exploit any and all copyrighted songs, images, or video which are included in the Licensed Content in the computerized Karaoke System.

(b) The rights to collect fees relating to Karaoke Performances and relevant license fees from the Outlets with respect to the usage and/or exploitation of the Licensed Contents and music contents as owned and/or controlled by the Other Record Labels via the Karaoke System therein.

(c) The right to use and authorize usage of the names, photos, biographies and likeliness of the Artists and the available promotional materials in connection with the Licensed Contents throughout all promotional and marketing channels in the Territory for marketing and promotion of the Outlets.

(d)   The right to sub-license the rights as specified in Sections 2(a) to 2(c) above to its affiliates, and authorized Outlets in the Territory save that the duties and obligations of TCW shall remain unaffected and that TCW shall provide the Record Company a list of all such affiliates and authorized Outlets on a calendar quarterly basis.

### 3.   LIMITATIONS & UNDERTAKINGS BY TCW

(a)   The rights granted by the Record Company in this Agreement are limited to the exclusive use of the Licensed Contents in the manner expressly described in Section 2. Any and all other rights in connection with the Licensed Contents are specifically reserved by the Record Company. Unless otherwise expressly provided in this Agreement, there is no implied license or otherwise and no sublicense or assignment of any rights is permitted without the Record Company's consent.

(b)   TCW shall not edit, change or alter in any way any Licensed Contents.

(c)   TCW shall not enable any download of any Licensed Contents, nor shall it provide public broadcasting. Subject to the rights as granted under Section 2 above, TCW will not engage or enable any unauthorised use or utilization of the Licensed Contents, nor may it use or enable usage of any name or image of the Record Company or any Artists without the consent of the Record Company.

(d)   TCW shall ensure that proper copyright and other notices and credits are provided for in the Outlets upon Karaoke Performances of the Licensed Contents therein.

(e)   TCW shall use its reasonable endeavors to ensure that there are sufficient protection against unauthorized copying or distribution of the Licensed Contents in the Territory.

### 4.   PAYMENTS

In consideration of the rights granted hereunder, TCW shall pay to the Record Company:

(a)

**REDACTED**

(i)   the Record Company duly executes and delivers this Agreement to TCW on or before 1st March, 2003 together with the preliminary list of Back Catalog (including recordings as released between 1st January, 1997 and 30th November, 2002) which shall be finalized and agreed by both parties within 30



days and then shall serve as <u>Attachment 1</u> hereto and the list of Control Catalogs (as available at the Effective Date) as <u>Attachment 2</u> hereto; and

    (ii) receipt by TCW of duly executed license agreement from the majority of the record labels (including the Record Company and Other Record Labels) with respect to grant of rights on terms and conditions similar to this Agreement;

  (b) upon obtaining a copy of karaoke music video version of the Control Catalogs, the relevant Control Catalog Royalties;

  (c) **REDACTED**

  (d) **REDACTED**



  (e) the business model, progress, practice, and condition of TCW shall be discussed annually during a panel discussion which shall include representatives of TCW, the Record Company, and participating Record Labels.

## 5.  **REPRESENTATIONS & WARRANTIES**

  (a) The Record Company represents and warrants that:

    (i) it possesses full right, power and authority to enter into and perform this Agreement and to grant the rights pursuant to the terms and conditions of this Agreement;

    (ii) it owns and/or controls the entire copyright throughout the Territory in and to the Licensed Contents for the purpose of granting the rights under this Agreement and will continue to do so for the entire term of this Agreement and TCW's exercise of any of its rights granted hereunder will not infringe any rights of any person, firm or corporation;

    (iii) it has not and will not, so long as this Agreement remains in effect, grant or attempt to grant to any other person, firm or corporation rights of any kind in any of the Licensed Contents in the Territory, the exercise of



which would derogate from or be inconsistent with the rights granted to TCW hereunder;

(iv) prior to the dispatch to TCW of any masters of the Licensed Contents, the Record Company has obtained and will obtain all necessary consents for exploitations thereof by TCW pursuant to this Agreement (including all consents necessary for the use by TCW of the names, photographs and likeness of the Artists);

(v) except as otherwise expressly provided herein, TCW shall be under no liability whatsoever to any Artists or to any other third parties, whose services and/or performances are engaged for the preparation, production and completion of the Licensed Contents for whom the Record Company (or its designated or authorised party) may be obliged to pay in connection with the use or performance of the License Contents pursuant to the relevant contracts as granted under this Agreement.

(b) TCW represents and warrants that:

(i) it is properly authorize to enter into this Agreement and will duly perform and observe the terms and conditions of this Agreement;

(ii) it shall comply with all applicable laws;

(iii) except for those licenses and consents which the Record Company is responsible for on the terms hereof, it and/or the Outlets(where applicable) shall be responsible to directly deal with all publishers of the musical/lyrical components of the Licensed Contents and obtain all necessary licenses and consents required for reproduction, Karaoke Performance or other use of the music compositions embodied in the Licensed Contents ("Copyright Licenses") and all payments relating thereto. For clarification, the Record Company grants only those copyrights which it possesses to TCW. The Record Company is not required to obtain publishing clearance for the Licensed Content.

6. **ACCOUNTING**

(a) TCW shall furnish to the Record Company within 60 days of 30 June and 31 December in each calendar year during the Term a statement of account. Subject to recoupment under Section 4(a) above and necessary withholdings and taxes and duties, the statements shall be forwarded simultaneously with all payments due (if any) to the Record Company for the attention of The Finance Director. Statements shall be rendered whether or not payments are due to the Record Company.

(b) The Record Company shall have the right on 10 (ten) days prior notice in writing to inspect the books of TCW (or its affiliates or agents, as the case may be) insofar as the said books relate to the use and exploitation of the Licensed Contents and any monies, fees or payments payable to the Record Company

hereunder. In the event that any such inspection reveals an underpayment to the Record Company, TCW will make good any underpayment revealed by the Record Company within 30 days. Provided however, that if the statements are understated by 10% or more, TCW shall reimburse the Record Company the costs incurred for inspection up to a maximum of the underpayment itself in question together with the underpayment.

## 7. RECORD COMPANY'S OBLIGATIONS

(a) During the Term, the Record Company shall, from time to time, provide and update the list of Control Catalogs to include additional recordings for license under this Agreement.

(b) Within thirty (30) days after the Effective Date, the Record Company shall provide karaoke music video versions of the Back Catalogs (as listed out in <u>Attachment 1</u> and if necessary) and the Control Catalogs (subject to payment of the relevant Control Catalog Royalties) as listed out in <u>Attachment 2</u> which are available as at the date thereof. Throughout the Term, the Record Company shall provide TCW a list of the karaoke music video version of any new Control Catalogs on a monthly basis and within fifteen (15) days thereafter, provide one copy for each of the karaoke music video version of the relevant Control Catalogs to TCW for usage on the terms under this Agreement. In such case, TCW shall pay the Control Catalog Royalties in respect of the Licensed Contents so provided and delivered. All copies as provided in accordance with this Section 7(b) will be provided in such formats as determined by the Record Company. The copies shall be delivered by the Record Company to the Hong Kong office of TCW as specified by TCW from time to time.

(c) Upon formal execution of this Agreement, the Record Company shall provide all necessary documentation (including letter of authorisation or warranty) confirming its rights and/or ownership to the Licensed Contents and the grant of the relevant rights therein to TCW for TCW's exercise and/or implementation of the rights under this Agreement, including carrying out the copyright registration in the Territory.

## 8. OWNERSHIP

(a) TCW hereby acknowledges that it asserts no ownership rights in the copyrights involved in this Agreement, and confirms that, as between itself and the Record Company, Record Company represents that the Record Company is the exclusive owner of all copyrights and other rights in and to the Licensed Contents and all Licensed Contents are and shall be and remain the sole property of the Record Company.

(b) TCW shall take all reasonable steps to prevent any unauthorized usage of the License Contents in the Territory for the scope as specified under this Agreement and shall ensure that no such unauthorized usage is carried out in any Outlets in the Territory. TCW shall immediately notify the Record Company in the event that it is aware of any infringement or potential infringement of the rights



as granted hereunder with respect to the Licensed Contents. In the event of any such infringement or potential infringement, TCW shall have the right to determine whether a proceeding should be brought against any third parties and if TCW decides to take necessary actions, the Record Company shall provide all documentation and assistances to TCW for the purpose of carrying out the actions.

### 9. TERM & TERMINATION

(a) This Agreement shall commence on the Effective Date and continue for five (5) years thereafter (the "Initial Term"), unless renewed or otherwise extended or early terminated pursuant to the terms hereunder.

(b) Upon the expiration of the Initial Term, TCW shall have the right to renew and extend the Term of an additional three (3)-year period commencing from the last day of the Initial Term.

(c) Either party may terminate this Agreement on the following events:

(i) the other party is in material breach of any of its representations, warranties, agreements or obligations hereunder, which breach is not remedied within thirty (30) days from the date of written notice by the non-breaching party;

(ii) the other party is or will become dissolved or liquidated, makes an assignment for the benefits of the creditors, files a petition under any applicable bankruptcy act, receivership statute or the like or becomes or will become bankrupt or otherwise insolvent other than for the purpose of reorganisation of amalgamation;

(iii) either party is prevented from fulfilling its obligations due to a force majeure event for more than six (6) months from the occurrence of such event, then either party shall have the right to terminate the Agreement with immediate effect by written notice. For the purpose of this Section 9(c)(iii), a "force majeure event" means a event which results in failure or delays in performing the obligations of either party hereunder and which arises from cause(s) beyond such party's control, including but not limited to acts of God, acts of civil or military authority, fires, strikes, lockouts or labour disputes, governmental restrictions, wars, riots, earthquakes, typhoons.

### 10. EFFECT UPON EXPIRATION OR TERMINATION

Upon termination or early expiration of the Term hereunder, TCW shall by its reasonable endeavours:

(a) cease to use and requesting cessation by the Outlets to continue to use any Licensed Contents and any digitization (if any), reproduction thereof; and

(b)  return or destroy (at the Record Company's reasonable prior instruction in writing) all Licensed Materials (and all copies thereof) if the same are in direct possession and control of TCW as at the time thereof.

Upon the expiration the Term or earlier termination of this Agreement, all rights granted by the Record Company shall forthwith revert to the Record Company.

## 11. INDEMNIFICATION

Each party shall at all times defend, indemnify and hold harmless the other party from and against any and all third party claims, damages, liabilities, costs and expenses (including reasonable legal expenses and fees) arising out of any material breach by the indemnifying party, or clam of a breach, which if true, would constitute a material breach by the indemnifying party, of any representation, warranty, obligation or agreement made by the indemnifying party in this Agreement.

## 12. NOTICES

Any notice given by one party to the other shall be deemed properly given if specifically acknowledged by the receiving party in writing or when delivered to the recipient by hand, fax or special courier during normal business hours to the following addresses (or such other address as may be notified in writing from time to time by either party):

(a)  if to TCW, to:  TC Worldwide, Ltd.
Attn: Maria Wan
Fax No: 1-646-349-4456

(b)  if to Record Company, to:  Cinepoly Records
Company Limited
Attn: Hung Tik
Fax No: 852 2730 6166

Notices shall be deemed to be received on the first business day following receipt. Each communication and document made or delivered by one party to another pursuant to this Agreement shall be in the English language.

## 13. CONFIDENTIALITY

Each party ("Receiving Party") shall not disclose to third parties nor use for any purpose other than for the proper fulfillment, compliance or performance of this Agreement, this Agreement or any technical, financial or commercial information ("Information") received from the other party ("Disclosing Party") in whatever form under or in connection with this Agreement without the

prior written permission of the Disclosing Party. The above mentioned limitations shall not apply to Information which:

(a) was in the possession of the Receiving Party prior to disclosure hereunder; or

(b) was in the public domain at the time of disclosure or later became part of the public domain without breach of the confidentiality obligations herein contained; or

(c) was disclosed by a third party without breach of any obligation of confidentiality owed to the Disclosing Party; or

(d) was independently developed by personnel of the Receiving Party having no access to the Information; or

(e) was required to be disclosed by any laws, regulations and/or rules of stock exchange.

## 14. ASSIGNMENT

TCW shall not be entitled to assign or transfer all or any of its rights, benefits and obligations under this Agreement without the prior written consent of the Record Company save and provided that nothing herein shall affect the right of TCW under Section 2(d) above.

The Record Company may transfer or assign, in whole or in part, this Agreement (or its rights, interests or obligations hereunder) to any of its affiliates, or to any person becoming an affiliate of the Record Company.

## 15. MISCELLANEOUS

(a) This Agreement states the entire agreement between the parties relating to the subject matter hereof and supersede all prior communications, whether written or oral, between the parties. All amendments and modifications to this Agreement shall be made by an instrument in writing signed by both parties.

(b) Governing Law and Jurisdiction

This Agreement shall be governed by and construed in accordance with the laws of Hong Kong Special Administrative Region and the parties hereby submit to the exclusive jurisdiction of the Justice Court of Hong Kong Special Administrative Region.

(c) Severability

If any part, term or provision of this Agreement is held to be void, illegal, unenforceable or in conflict with any law of a state or government

having jurisdiction over this Agreement, the validity of the remaining portions or provisions shall not be affected thereby.

(d) Parties Not Partners

Nothing in this Agreement shall constitute a partnership, agency relationship or joint venture among the parties nor constitute one party the agent of the other party and vice versa. Except as set out in this Agreement, no party shall have express or implied authority to bind or represent any other party for any purpose whatsoever unless expressly agreed in writing by the party concerned.

**IN WITNESS WHEREOF**, the parties hereto have caused their duly authorised representatives to execute this Agreement as of the date set forth above.

Cinepoly Records Company Limited
For and On Behalf Of
**CINEPOLY RECORDS CO. LTD.**

By: _____
       *Authorised Signatory*
Name: Hung
Title: Managing Director


TC Worldwide Ltd
   For and on behalf of
   T.C. WORLDWIDE LIMITED

By: _____
       *Authorised Signature(s)*
Name: Maria Wan
Title: Chairwoman and C.O.O.