# EXHIBIT D

## TO DECLARATION OF **LINDSAY J. HULLEY**
## IN SUPPORT OF **OPPOSITION** TO PLAINTIFFS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT

Dockets.Justia.com

## KARAOKE BLANKET AGREEMENT

This AGREEMENT is made October 1, 2003 (the "Effective Date"), by and between Priddis Music, Inc., P.O. Box 345, 50 Executive Boulevard, Pleasant Grove, Utah 84062-0345, attention: Lainee Price (hereinafter referred to as "Producer"), and EMI ENTERTAINMENT WORLD INC., 810 Seventh Avenue, New York, New York 10019 (hereinafter referred to as "EMI").

WHEREAS, EMI controls the music publishing rights in certain musical compositions (hereinafter collectively referred to as "Compositions" and individually referred to as "Composition") in the music publishing catalogs listed on SCHEDULE A attached hereto (hereinafter collectively and individually referred to as "Publisher"); and

WHEREAS, Producer desires to obtain and Publisher desires to grant a license for the use of the Compositions in synchronism with certain non-dramatic generic visual images (each a "Karaoke Production") to be included in various karaoke Compilations (as defined below) in the Formats (as defined below), which, in conjunction with a machine or device, reproduce the Karaoke Production for "sing-a-long" purposes only, and which may further display on a screen the lyrics of the Composition with background visual images.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties hereto agree as follows:

1.    Grant of Rights

Subject to the terms, conditions and limitations hereinafter set forth in this Agreement and to the execution of an applicable Addendum of Rights ("Addendum"), as such term is defined in paragraph 5, and to the payment of the applicable fee(s) for the rights granted, Publisher hereby grants to Producer the following non-exclusive, limited rights:

(a)    to arrange and record up to full use of a Composition in one (1) background instrumental audio version, with or without a guide vocal, in synchronism or timed-relation with certain visual elements to be described in the Formats listed below, to create a Karaoke Production embodying said Composition. For purposes of clarification:

(i)    No guide vocal included in a Karaoke Production shall be a soundalike recording in which the singers or musicians perform the Composition in such a manner as to imitate or simulate an earlier recorded performance of the Composition by an artist who may have made a distinctive popular recording of the Composition; and

(ii)    In no event shall the length of use of a Composition in a Karaoke Production be longer than the natural length of said Composition.

(b)    to visually display the printed lyrics of a Composition as part of a Karaoke Production.

(c)    to compile Karaoke Productions together with each other and/or with karaoke productions of musical compositions owned or controlled by third party publishers (each a "Compilation"), and to reproduce said Compilations in only the following formats (the "Format(s)"):

(i)    Compact Disc Graphics ("CDG") Karaoke Format

The CDG Karaoke Format is defined as a 5-inch compact disc capable of reproducing the instrumental audio version, with or without a guide vocal, of the Composition therein, while displaying the printed lyrics thereof, in synchronism with still graphic visual images interposed between the Composition and another next preceding or following Composition, or between sections of the lyrics of the same Composition.

1

    (ii)    <u>Compact Disc Video ("CDV") Karaoke Format</u>

The CDV Karaoke Format is defined as a 5-inch compact disc capable of reproducing the instrumental audio version, with or without a guide vocal, of the Composition therein, while displaying the printed lyrics thereof, in synchronism with moving graphic visual images interposed between the Composition and another next preceding or following Composition, or between sections of the lyrics of the same Composition.

    (iii)    <u>Digital Video Disc ("DVD") Karaoke Format</u>

The DVD Karaoke Format is defined as a 5-inch single or dual layered, single or double sided disc read by laser, which is capable of reproducing the instrumental audio version, with or without a guide vocal, of the Composition therein, while displaying the printed lyrics thereof, in synchronism with moving visual images interposed with the Composition and between another next preceding or following Composition, or between sections of the lyrics of the same Composition.

    (iv)    Should Producer desire to release Compilations (that include one or more Karaoke Productions) in a format other than the Format indicated above, Producer and Publisher shall negotiate in good faith a license to include Karaoke Productions in such new format prior to the release of any such new formats. Release of Compilations (that feature Karaoke Productions) in such new formats prior to completion of such negotiations shall be a material breach of the terms of this Agreement, shall render all aspects of this Agreement immediately null and void, and this Agreement shall automatically terminate.

    (d)    To manufacture "Copies" of the Compilations (which term as used herein shall mean each and every unit of each and every Compilation) in the Format described above provided that such Format cannot be altered or manipulated in any manner (except for a mechanism allowing the change of key or tempo) and to distribute said Copies by sale or otherwise for the purpose of "home use" and in "Karaoke Bars" and similar venues in each country of the Territory, subject to the terms and conditions hereof.

    (e)    It is understood that Publisher is only licensing its controlling interest in a Composition. To the extent that a Composition is controlled less than one hundred (100%) percent by Publisher, prior to Producer's exercising any rights in said Composition, Producer must first secure the applicable rights from the co-publisher(s) of said Composition.

    (f)    The statements contained in the two "Whereas" paragraphs above are material to this Agreement and are incorporated herein by this reference.

2.    <u>Territory</u>

The "Territory" covered by this Agreement shall be the World. Notwithstanding the foregoing, pursuant to the rights controlled by the Publisher, the Territory of each Addendum may be limited to certain countries within the Territory, as indicated on said Addendum.

3.    <u>Term of Agreement</u>

The Term of this Agreement shall be two (2) years, commencing as of the Effective Date hereof (the "Term").

2

4.     Term of Addendum

The Term of each Addendum for Compositions licensed during the Term shall be for a period of three (3) years from the earlier of the release date of the applicable Compilation or the date of complete execution of the applicable Addendum unless otherwise noted, and provided further that Producer shall advise Publisher of a release date and product number of each Compilation containing at least one (1) Karaoke Production ("Term of Addendum"). Notwithstanding anything to the contrary contained in this Agreement, no Term of Addendum shall endure beyond September 30, 2008.

5.     Addendum of Rights

(a)     Producer acknowledges receipt of a list of Compositions that Producer may consider for use in a Karaoke Production. Upon Producer furnishing Publisher with a request for an individual licensing agreement covering the use of a Composition in a Karaoke Production to be used in a Compilation, Publisher shall furnish Producer with two (2) copies of a completed short form agreement ("Addendum"), a copy of which is attached hereto as Schedule B, which document shall reflect the terms and conditions of the rights agreed to between Producer and Publisher. Said Addendum shall be executed on behalf of the Producer and shall be forwarded to Publisher, accompanied by the applicable payments (Reproduction Fee, Advance, or royalties, all as set forth below). The rights granted pursuant to any Addendum shall not be in effect until Publisher has received the executed Addendum, together with the applicable payment to Publisher by a manner which permits sending and delivery to be verified. Upon Publisher's receipt of the executed Addendum together with any applicable payment, the Addendum shall be considered an amendment to this Agreement and, therefore, subject to all the terms and conditions herein contained.

(b)     Upon execution of this Agreement, the parties will simultaneously execute the first Addenda, which shall reflect all Compositions currently in use (or imminently in use) in Karaoke Productions on Compilations, and Producer shall simultaneously pay Publisher all the Reproduction Fees, Advances and/or royalties due thereupon.

(c)     From time to time throughout the Term, Producer may nominate additional musical compositions to be licensed hereunder and become "Compositions" by notifying Publisher of same, which notice shall include song titles, composers' names and applicable publishing catalogs. Provided Producer is in full compliance with all payment and accounting obligations, Publisher shall use commercially reasonable efforts to clear these additional musical compositions, and if Publisher is able to do so, Publisher shall prepare an additional Addendum and furnish two (2) copies thereof to Producer, and the procedure set forth above with respect to Addenda shall govern. In no event shall a nominated additional musical composition become a Composition without Publisher's prior written approval.

6.     Reproduction Fee

For each Composition licensed by Producer hereunder and used in a Karaoke Production, Producer shall pay Publisher a non-returnable Reproduction Fee in the amount of Publisher's Prorata Share of One Hundred Fifty ($150.00) Dollars multiplied by the number of Compilations in which a Karaoke Production of such Composition is or will be embodied. For the avoidance of doubt, each use of a Composition in a Compilation will require the payment of a separate Reproduction Fee and the use of such Composition in multiple Compilations will require the payment of one or more additional Reproduction Fees. Reproduction Fees shall not be recoupable against any Advance and/or royalties (both as set forth below) payable under this Agreement. Reproduction Fees shall be payable upon execution of the applicable Addendum. As used in this Agreement, "Publisher's Prorata Share" shall mean that percentage of Publisher's ownership and control of the applicable Composition, as set forth on the applicable Addendum.

7.    Advance/Royalties

(a)    For each Composition licensed by Producer hereunder and used in a Karaoke Production during the Term, in addition to the applicable Reproduction Fee set forth in Paragraph 8 above, upon execution of the Addendum, Producer shall also pay to Publisher the sum of Two Hundred Twenty Five ($225.00) Dollars which amount represents a non-returnable "Advance" at a rate of fifteen ($0.15) cents per Karaoke Production per Copy against the first one thousand five hundred (1,500) Copies of such particular Compilation to be manufactured and distributed, which amount shall be indicated in paragraph 4(b) of the Addendum.

(i)    It is understood that recoupment of the above Advance shall be calculated on an individual Compilation and Composition-by-Composition basis.

(ii)    For purposes of clarification, the parties acknowledge that a separate Advance shall be paid to Publisher for each Compilation which embodies a Karaoke Production of a Composition, and in no event shall royalties from one Compilation (embodying a Karaoke Production) be used to recoup the Advance respecting a different Compilation (embodying the same Karaoke Production), i.e., no cross-collateralization amongst different Compilations (or different Karaoke Productions) shall be permitted.

(b)    With respect to any particular Karaoke Production, until the above sales level is achieved, no further payments shall be made to Publisher. When the above sales level is achieved, Producer shall pay royalties to Publisher at the above rate, in accordance with the terms and conditions of paragraph 8 below.

(c)    It is understood that certain Compositions may require prior approval from the writers and/or copublishers thereof and may not be available for licensing pursuant to this Agreement or may require higher fees in order to license.

(d)    It is further understood that the fees set forth above are for Compositions controlled one hundred (100%) percent by Publisher and that such fees shall be prorated based on the percentage controlled by Publisher, as indicated on the applicable Addendum. It is further understood that for monies owed for certain Compositions, upon request by Publisher, Licensee shall make direct payments of said monies to certain third parties.

(e)    In the event Producer agrees to (or has agreed to) pay to a co-publisher of a Composition or to the publisher of a musical composition to be included in any Karaoke Production, compensation or consideration (collectively, "Compensation") in excess of the compensation or consideration to be paid to Publisher hereunder, or if Producer agrees to (or has agreed to) the inclusion of any provision in any license memorializing such agreement which provision is more favorable to such licensor than the comparable provision hereunder, then effective as of the date of such agreement with any such licensor, Producer shall immediately pay to Publisher an amount equal to such Compensation in excess of the compensation or consideration to be paid to Publisher hereunder (the "Excess") and this Agreement shall be deemed amended effective as of the date of such agreement with any such licensor, to include such more favorable provision. In the event the Composition is not entirely controlled by Publisher, the Excess shall be based upon and shall reflect Publisher Prorata Share of the Composition. Upon request, Producer shall supply to Publisher copies of all agreements between Producer and all third parties which are licensing any portion of the Composition or a musical composition to Producer.

4

8.    Accountings

(a)    Producer shall render accounting statements to Publisher on a semi-annual basis, within forty-five (45) days following each June 30 and December 31 during the Term. Said accounting statements shall be provided electronically (along with a hard paper copy), indicating, on a country-by-country, and Karaoke Production-by-Karaoke Production (including the title, writers' name(s), and applicable Publisher-supplied EMI song code for each Composition embodied in each Karaoke Production) basis, the number of Copies (containing at least one (1) Karaoke Production) of each Compilation sold or otherwise distributed and not returned in the Territory, within such six (6) month period, whether or not there have been any said Copies sold or otherwise distributed within such semi-annual period. Such accounting shall be accompanied by payment of all royalties, if any, shown to be due on such statement.

(b)    Publisher, by its designated representative, shall have the right, upon reasonable written notice, and during normal office hours, to examine the books and records of Producer as the same pertain to the subject matter of this Agreement and to make copies and extracts thereof. Producer shall cooperate with Publisher's representative to assist them in understanding all such material. If, as a result of any audit, it is determined that Producer has understated the royalties due to Publisher, Producer shall immediately pay to Publisher the amount by which royalties have been understated. If, as a result of any audit, it is determined that Producer has understated the royalties due to Publisher by ten (10%) percent or more, Producer shall immediately pay to Publisher the amount by which royalties have been understated and shall reimburse Publisher for all reasonable costs of the audit.

(c)    All accountings and payments must be received by Publisher on the date such payment and statement is due, according to the terms of this Agreement, time being of the essence hereof. All payments shall be made in United States dollars, shall be paid by check (or other method agreed to in writing by Publisher), shall be made payable to EMI Entertainment World Inc., and shall be sent to address specified in paragraph 18 below.

(d)    No payments shall be diminished or reduced in any manner for any reason, including without limitation, any withholdings, currency restrictions, exchanges or taxes, providing Publisher has provided Producer with a current W-9 form for each Publisher name receiving payment.

(e)    Producer agrees to pay Publisher royalties on all Copies sold and/or given away as free goods, i.e., all Copies distributed, regardless of price, shall bear a full royalty hereunder.

(f)    Without limiting Publisher's rights and remedies hereunder, at law or in equity, (i) payments that are past-due by more than forty-five (45) days are subject to and to be accompanied by payment of interest thereon at the prime rate as established on the due date by The Bank of New York plus two (2%) percent compounded daily (or the maximum rate allowed by law, whichever is less) and computed from the date(s) upon which each such payment(s) first became due until the date(s) upon which each such payment(s) is remitted to Publisher and (ii) Producer shall reimburse Publisher, within ten (10) days from receipt of its invoice, for EMI's reasonable attorney's fees and costs arising out of the occurrence of any uncured Default Event (as defined in paragraph 17), including, without limitation, any failure by Producer timely to render statements and account to Publisher with respect to royalties which accrue to Publisher in connection with Producer's exploitation of its rights pursuant to the applicable provisions hereof.

9.    Public Performance

The fees and royalties payable hereunder do not include public performance fees which may become payable by any establishment by reason of its public performance of the Composition. Any party publicly performing the Composition is required to obtain a public performance license, at the discretion of the Publisher, either directly from the Publisher, from the appropriate performing rights society or from another designee of Publisher.

5

10.    Copyright Notice

(a)    Producer agrees that in conjunction with the use of the Composition in the Karaoke Production, each copy of the Karaoke Production shall display a copyright notice on the screen and/or any book or CD insert accompanying the Compilation containing said Karaoke Production, in the form set forth in paragraph 5 of the applicable Addendum.

(b)    No casual or inadvertent failure by Producer to comply with the provisions of subparagraph (a) above shall be deemed a material breach of this Agreement, provided that if notified of such failure, Producer shall rectify any such failure on all future duplication of the Karaoke Production(s) in question.

11.    Sell Off

(a)    Upon expiration or termination of the Term of the applicable Addendum, all rights herein granted shall cease and terminate and the right to make or authorize any further use of any Copies of the applicable Compilations made hereunder shall also cease and terminate, subject to Producer's right to sell off its inventory of Copies of such Compilation manufactured and not sold for a period of three (3) months after such expiration or termination (the "Sell-Off Period"), provided that royalties with respect to that period are paid and statements are furnished in accordance with paragraph 8 hereof.

(b)    Within thirty (30) days after the expiration or termination of the Term of any Addendum, Producer shall furnish Publisher with a statement, certified by Producer's chief financial officer, showing the number of Copies of the applicable Compilation (together with a list of all Karaoke Productions. included in said Compilation) covered by this Agreement which are on hand or in process. Publisher (or its authorized representative) shall have the right to take a physical inventory to verify the accuracy of the certified statement. In the event Producer shall fail to furnish such certified statement and/or shall refuse to permit such physical inventory, Producer shall forfeit it's right to dispose of such inventory after the expiration of the Term of the applicable Addendum, i.e., there shall be no Sell-Off Period.

(c)    Producer shall not stockpile copies in contemplation of the expiration of the Term of any Addendum.

(d)    In the event of termination of this Agreement other than by the effluxion of time (and without limiting either party's other rights or remedies, at law or equity), there shall be no Sell-Off Period and all rights herein granted to Licensee hereunder shall immediately terminate and shall thereupon revert to EMI, free and clear of any claims by Licensee or anyone deriving any rights from Licensee. In the event of such termination, Licensee shall, within thirty (30) days of such termination provide EMI with a full accounting showing all royalties due EMI hereunder, and any royalties due and unpaid by Licensee pursuant to this Agreement shall thereupon become due and payable. Licensee shall at the same time pay EMI all such sums due.

12.    Reservation of Rights

(a)    This Agreement does not authorize or permit any use of a Composition not expressly set forth herein and does not include the right: to alter the fundamental character of the music or the lyrics of a Composition (and specifically the terms of this Agreement are limited to the use of a Composition only as originally fixed in the Karaoke Production (i.e., manner, placement, use)); to make foreign adaptations and/or translations of the music and lyrics of a Composition; to use the title or subtitle of a Composition as the title of any Compilation; to use the story of a Composition, to use any composer's name; to use a particular recording or soundalike recording of a Composition; or to make any other use of a Composition not expressly authorized hereunder. Publisher reserves all rights not expressly granted to Producer hereunder. All rights granted hereunder are granted on a non-exclusive basis.

6

(b)    Producer also agrees that in connection with the use of a Composition in a Karaoke Production, said Composition shall not be used in a dramatic fashion as such term is understood in the industry or in any fashion which could be considered in bad taste or offensive; i.e., each Composition shall be used with regard to social convention and decency and so as not to bring said Composition, its composers or Publisher into public disrepute or reflect adversely on the Composition, its composers or Publisher.

(c)    (i) ·   No telecast, exhibition, broadcast or transmission of the material contained in the Karaoke Production of any Composition licensed hereunder is to be made by Producer without a prior synchronization license being obtained by Producer from Publisher.

(ii)    No rights are granted for transmission on any on-line services, cable, satellite, interactive television or any other media or technology specifically not set forth above. Use of a Composition on any such media or technology shall require Publisher's written consent and may require additional payments and/or royalties to be negotiated in good faith prior to such use.

(iii)    Any such telecast, exhibition broadcast, transmission or authorization of such telecast, exhibition, broadcast or transmission by Producer shall be a material breach of the terms of this Agreement, shall render all aspects of this Agreement immediately null and void, and this Agreement and all terms thereof shall be terminated.

(d)    This Agreement does not authorize or permit any use of a Composition in conjunction with any use not specifically authorized hereunder, including but not limited to, video clips, video booths, CD interactives or similar types of technology and does not authorize or permit the manufacture or distribution of phonorecords. If any such rights are exercised by the Producer in connection with the Karaoke Production of any Composition licensed hereunder, this Agreement shall immediately terminate. For purposes of this Agreement, a video booth shall be defined as an area where a karaoke performance · is recorded or videotaped.

13.    Warranties and Representations

(a)    Publisher warrants only that it has the legal right, power and authority to grant this license and this license is given and accepted without any other warranty or recourse. Publisher hereby agrees to indemnify and hold harmless Producer and its respective officers, directors, agents, and employees (hereinafter, the "Indemnitees") from and against any and all liabilities, damages, costs, charges, recoveries, judgments, penalties, expenses or losses of whatsoever kind or nature, actually incurred by the Indemnitees (including reasonable attorneys' fees and disbursements) which may be obtained against, imposed upon or suffered by the Indemnitees or any of them, by reason of any breach by Publisher of any of its warranties or representations hereunder. In no event shall the total liability of Publisher in connection with the rights granted for each Composition licensed hereunder exceed the consideration received by Publisher in connection with the licensing of said Composition. Producer will give Publisher prompt notice of any claim and Publisher will have the right to assume the defense thereof at Publisher's expense.

(b)    Producer represents and warrants that:

(i)    · there are no actions, suits, proceedings, agreements or other impediments, actual or threatened, which would prevent or impair it from performing its duties and obligations hereunder;

(ii)    it is fully empowered to enter into this Agreement and to perform its duties and obligations hereunder, that it is and shall at all times remain possessed of all rights necessary for it to completely fulfill all of its material obligations hereunder, and that its entering into this Agreement and fulfilling such obligations does not and shall not infringe upon the rights of any person whatsoever;

(iii)   excepting the Compositions, none of the Karaoke Productions produced hereunder, nor the performances embodied therein, nor any other Materials (as hereinafter defined) nor any use thereof by Producer or its affiliates, assigns or customers will violate or infringe upon the rights of any Person. As used herein, "Materials" mean all musical, dramatic, artistic and literary materials, ideas and other intellectual properties furnished or selected by Producer (excepting the Compositions) and contained in or used in connection with the Karaoke Productions hereunder; and

(iv)   Producer shall be responsible for all recording, production and other costs and sums which may be or become due to performers, producers or other Persons with respect to Karaoke Productions hereunder and that except as expressly provided herein to the contrary and except with respect to contractual obligations contained in contracts executed by Publisher, Publisher shall have no monetary obligation whatsoever to Producer or any other party for or in connection with this Agreement or Producer's exercise of its rights hereunder.

(c)   Producer agrees to fully indemnify EMI and each Publisher and hold EMI (and each Publisher) (and its and their respective officers, directors, and employees) harmless of and from any and all liabilities, claims, causes of actions, damages, interest, charges, recoveries, judgments, penalties, expenses or losses of whatsoever kind of nature, (including without limitation, legal expenses and counsel fees and disbursements) of any kind whatsoever which may be occasioned, suffered or incurred by EMI (and each Publisher), either directly or indirectly, in whole or in part, resulting from or in connection with any breach or threatened breach by Producer of any of the terms, covenants, representations and warranties contained herein, and/or any claim by any Person inconsistent with any of the representations, warranties and covenants hereunder. In addition, Producer will reimburse EMI on demand for any payment made at any time after the date hereof for any liability or claim to which this clause relates that has resulted in a judgment against EMI or which has been settled with the written consent of Producer (which consent shall not unreasonably be withheld). EMI will give Producer prompt notice of any claim and Producer will have the right to assume the defense thereof at Producer's expense.

14.   Arrangements/Copies

(a)   Any arrangement(s) which Producer shall cause to be made of a Composition in the creation of a Karaoke Production shall be made at Producer's own expense and shall be created only as the result of employment-for-hire, and such arrangement shall be "Work Made For Hire" as such term is used in the United States Copyright Law. Producer hereby sells, assigns and transfers any such arrangement to Publisher and the worldwide copyright and renewals and extensions of copyright therein. The arranger shall not be entitled to authorship credit or status as a collaborator or any remuneration by way of royalty or otherwise from the composers of such Composition or from Publisher or any of Publisher's designated agents. No arrangement shall change the basic melody of any Composition.

(b)   Producer shall promptly furnish Publisher with five (5) free copies of each and every Compilation that features at least one (1) Karaoke Production. These copies shall be royalty-free.

15.   Ownership

Producer shall not at any time, directly or indirectly, license, transfer, assign, sell or otherwise dispose of, pledge, mortgage or in any way encumber any Composition or any interest of any kind therein, and/or any right or license granted hereunder and any such purported license, transfer, assignment, sale, disposal, pledge, mortgage or encumbrance shall be void and of no effect.

8

16.    No Partnership

Nothing herein contained shall create any association, partnership, joint venture or relationship of principal and agent between the parties hereto; it being understood that the parties hereto are, with respect to each other, independent contractors, and neither party shall have any authority to bind the other or the other's representatives in any way and shall not hold itself out to any third party as having authority.

17.    Event of Default/Cure

(a)    As used herein, the term "Event of Default" shall mean any of the following events: (i) Producer's failure or inability to fulfill any of its material obligations hereunder for any reason; (ii) Producer's dissolution or the liquidation of any substantial portion of its assets; (iii) the filing by or against Producer of a petition for liquidation or reorganization or the commencement of an action against it under any applicable bankruptcy or insolvency legislation as now or hereafter in effect or under any similar statute relating to liquidation or reorganization or Producer's consenting to any of the foregoing; (iv) the appointment of a trustee, receiver, custodian or similar appointee for Producer or for any of its property or Producer consenting to any such appointment; (v) Producer's making of an assignment for the benefit of creditors; (vi) Producer becoming insolvent; or (vii) any action by Producer which jeopardizes any material right or remedy of Publisher hereunder.

(b)    Without limiting or affecting the rights or remedies which Publisher may have under this Agreement or at law or equity, with respect to Producer's obligations under this Agreement, it is agreed that if an Event of Default occurs or in the event of a breach on the part of Producer, Publisher will notify Producer in writing of such default or breach and Producer shall have ten (10) business days from receipt of such notice in which to cure such Event of Default or breach. If such breach or Event of Default is not curable or if not cured within said ten (10) business day period, this Agreement shall automatically terminate upon written notice from Publisher; provided, however, that with respect to the payment of any monies whatsoever, this Agreement shall automatically terminate upon written notice from Publisher if such particular breach is not remedied within five (5) business days from the date of the notice, and Publisher, in the event of an automatic termination under this paragraph and without prejudice to any other rights and remedies, shall have rights and remedies for copyright infringement, including injunctive relief.

(c)    The termination of this Agreement pursuant to this paragraph shall render the further exploitation of a Composition (as used in a Karaoke Production or otherwise) actionable as an act of copyright infringement fully subject to the remedies provided by the Copyright Act, Title 17, of the United States Code, together with other legal and equitable remedies available to Publisher.

18.    Notices

Any notices or other communication to be given to Producer shall be sent to Producer at the address on page 1 of this Agreement or to such other address as Producer may hereafter designate by notice in writing to EMI. All notices or other communication and all payments hereunder required to be made to EMI shall be sent to EMI at the following address or to such other address as EMI may hereafter designate by notice in writing to Producer. All notices, other communications and payments hereunder shall be hand delivered or sent by certified mail, return receipt requested, as follows:

To EMI:    EMI Entertainment World
           810 Seventh Avenue, 36th floor
           New York, New York 10019
           Attention: Jovanka Ciares, Music Services

9

Any notice shall be deemed complete when the same (containing whatever information may be required hereunder) is deposited in any mail box properly addressed and sent as aforesaid, except that (a) all materials personally delivered shall be deemed served when actually received by the party to whom addressed, (b) air express materials shall be deemed served on first business day following the day of delivery to the air express company, (c) notices of change of address shall be effective only from the date of actual receipt, and (d) royalty statements may be sent by regular mail, but shall be deemed rendered when actually received by EMI.

### 19.   Governing Law

This Agreement has been entered into and delivered in the State of New York and the validity, interpretation and legal effect of this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. Only the New York courts (state and federal) will have jurisdiction over any controversies regarding this Agreement, and the transactions contemplated by this Agreement; any action or other proceeding which involves such a controversy will be brought in those courts, in New York County, and not elsewhere. Producer hereby irrevocably submits to the jurisdiction of the New York courts (state and federal) in any such action or proceeding and irrevocably waives any right to contest the jurisdiction (in rem or in personam) or power or decision of that court within or without the United States other than appropriate appellate courts having jurisdiction over appeals from such court(s). Producer also irrevocably waives any defense of inconvenient forum to the maintenance of any such action or proceeding. Any process in any action or proceeding may; among other methods, be served upon Producer by delivering or mailing it in accordance with paragraph 15. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of New York.

### 20.   Assignment; Change of Control

This Agreement, and the rights, opportunities and obligations created pursuant to this Agreement, are not assignable or transferable in any manner by Producer, nor shall Producer sublicense or delegate any of its rights or obligations without the prior written consent of Publisher, not to be unreasonably withheld. EMI (and each Publisher) may assign this Agreement and any of its rights hereunder in whole or in part to any person or entity which controls, which is controlled by, or which is under common control with, EMI and/or each such Publisher or which is in partnership with EMI and/or each such Publisher; and/or to any parent, affiliated or subsidiary company or corporation, or to a Person or entity owning, or acquiring, all or a substantial part of EMI's and/or each such Publisher's stock and/or assets or with whom EMI and/or each such Publisher may merge or be merged, in which case Producer shall not be released from its obligations hereunder.

### 21.   Confidentiality; Publicity

Producer and Publisher agree that all information with respect to this Agreement shall be kept confidential. Such information shall not be disclosed at any time to any third party except to the extent required by an order of a court or other tribunal having jurisdiction or pursuant to rules and regulations of a governmental body. Notwithstanding the foregoing, the parties acknowledge and agree that in certain situations, such as where copublishers require a favored nations provision, the information contained in this Agreement may have to be divulged with respect to fees and rights granted. Producer and Publisher may not use the other party's name in news releases, articles, brochures and marketing and/or promotional materials, without the other party's prior written approval.

22.    Entire Agreement

(a)    This Agreement sets forth the entire understanding between the parties hereto with respect to the subject matter hereof, and merges and extinguishes all prior understandings, negotiations, and agreements. No amendment to or modification, waiver, termination, or discharge of this Agreement or of any provision hereof shall be binding unless confirmed by a written instrument duly executed by the party to be charged therewith. No waiver of any provision of or default under this Agreement shall affect the right of either party thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

(b)    If any part of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having the jurisdiction to make such determination, the remainder of this Agreement shall remain in full force and effect provided that the part of this Agreement thus invalidated or declared unenforceable is not essential to the intended operation of this Agreement.

23.    Miscellaneous

This Agreement is being entered into on an experimental and non-prejudicial basis, shall apply for the Term hereof only, and shall not be binding upon or prejudicial to any position taken by Publisher or Producer for any period subsequent to the Term of this Agreement. The captions of paragraphs contained in this Agreement are for reference only and are not to be construed in any way as a part of the agreement. This Agreement shall not become effective until executed by all proposed parties hereto.

IN WITNESS WHEREOF, the parties have caused the foregoing to be executed as of the date first above written.

EMI ENTERTAINMENT WORLD INC.                    Priddis Music, Inc.


By _____                      By _____


11

SCHEDULE A

LIST OF PUBLISHING CATALOGS

AVON GATE MUSIC INC. (BMI)
BARHAM BOULEVARD MUSIC, INC. (BMI)
BEECHWOOD MUSIC CORP. (BMI)
BURBANK PLAZA MUSIC, INC. (ASCAP)
CARWIN MUSIC INC. (ASCAP)
COLGEMS-EMI MUSIC INC. (ASCAP)
COMBINE MUSIC CORP. (BMI)
EMI AFFILIATED CATALOG INC. (BMI)
EMI AL GALLICO MUSIC CORP. (BMI)
EMI ALGEE MUSIC CORP. (BMI)
EMI APRIL MUSIC INC. (ASCAP)
EMI BELFAST MUSIC, INC. (BMI)
EMI BMPC CORP. (ASCAP)
EMI BLACKWOOD MUSIC INC. (BMI)
EMI BRILLIG MUSIC, INC. (ASCAP)
EMI DUCE MUSIC, INC. (ASCAP)
EMI EASY LISTENING MUSIC CORP. (ASCAP)
EMI FEIST CATALOG INC. (ASCAP)
EMI GOLD HORIZON MUSIC CORP. (BMI)
EMI GOLDEN TORCH MUSIC CORP. (ASCAP)
EMI GROVE PARK MUSIC, INC. (BMI)
EMI HASTINGS CATALOG INC. (BMI)
EMI INTERTRAX MUSIC INC. (BMI)
EMI JEMAXAL MUSIC INC. (ASCAP)
EMI MILLER CATALOG INC. (ASCAP)
EMI MILLS MUSIC, INC. (ASCAP)
EMI MOGULL, INC. (ASCAP)
EMI NORBUD MUSIC, INC. (BMI)
EMI NTM HOLDINGS, INC. (ASCAP)
EMI PST HOLDINGS, INC. (ASCAP)
EMI ROBBINS CATALOG INC. (ASCAP)
EMI SOSAHA MUSIC INC. (BMI)
EMI SLITHY SONGS, INC. (BMI)
EMI TSM HOLDINGS, INC. (BMI)
EMI U CATALOG INC. (ASCAP)
EMI UNART CATALOG INC. (BMI)
EMI VARIETY CATALOG INC. (ASCAP)
EMI VINE MUSIC, INC. (BMI)
EMI VIRGIN MUSIC, INC. (ASCAP)
EMI VIRGIN SONGS, INC. (BMI)
EMI WATERFORD MUSIC, INC. (ASCAP)
EMI WORLDTRAX MUSIC INC. (ASCAP)
FORAY MUSIC (SESAC)
FUN CITY MUSIC CORP. (ASCAP)
GLENWOOD MUSIC CORP. (ASCAP)
JOBETE MUSIC CO., INC. (ASCAP)
NEW TANDEM MUSIC, INC. (ASCAP)
SCREEN GEMS-EMI MUSIC INC. (BMI)
STONE DIAMOND MUSIC CORPORATION (BMI)
TRIPLE STAR MUSIC, INC. (BMI)
EMI FULL KEEL MUSIC  (ASCAP)
EMI LONGITUDE MUSIC  (BMI)

SCHEDULE B

ADDENDUM OF RIGHTS
[SAMPLE FORM]

Dated:

ADDENDUM to agreement by and between Priddis Music, Inc. ("Producer") and EMI ENTERTAINMENT WORLD ("EMI") effective as of October 1, 2003 (the "Agreement"), to be effective as of the date hereof covering the use of certain Compositions in Karaoke Productions which will be included in Compilation(s).

1.      The musical compositions (each, a "Composition" and collectively, the "Compositions") covered by this Addendum and the Compilation(s) on which said Composition(s) shall appear, are:

SEE ATTACHED SCHEDULE A

to be included in the following Compilations:

SEE ATTACHED SCHEDULE A

2.      The Term of this Addendum is as set forth in the Agreement

3.      The Territory covered by this Addendum is the World

4.      (a)     Reproduction Fee payable is One Hundred Fifty ($150.00) US Dollars for each Composition (based on 100%) used on a Compilation, for a total of: Three Hundred [$300.00] Dollars

ADVANCE(S) / ROYALTIES:

Advance payable and number of copies to be initially manufactured and sold is:

Two Hundred Twenty Five ($225.00) US Dollars (based on 100%), for each Composition used in a Compilation, as an advance against the first one thousand five hundred (1,500) copies of said Compilation, for a total of:

Four Hundred Fifty [$450.00] Dollars

(ii)    Royalty fee per Composition per copy of a Compilation (containing said Composition) manufactured and sold payable after the advance is recouped is fifteen($0.15) cents (based on 100%) through the remainder of the Term.

5.      The copyright notice to be included on each Karaoke Production is:

SEE ATTACHED SCHEDULE A

6.      SPECIAL PROVISIONS (i.e. special payments, etc.)

7.      All terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this ADDENDUM as of the day and year first above written.

[EMI PUBLISHER]                                        Priddis Music, Inc.

By _____          By: _____

13

Priddis Music
Schedule A

| Song Codes | Product # | Song Title | Writers | Publisher | EMI Share | Reproduction Fee | Advance on 1,500 Units | Copyright Notices |
|---|---|---|---|---|---|---|---|---|
| 504545 | 1503G | AMERICAN CHILD | P. Vassar/ C. Wiseman | EMI APRIL MUSIC INC. | 50% | $75.00 | $112.50 | "AMERICAN CHILD" Written by Phil Vassar and Craig Wiseman (c) 2002 EMI APRIL MUSIC INC., VASSARSONGS MUSIC, BMG Songs and Mrs. Lumpkin's Poodle. All rights for VASSARSONGS MUSIC Controlled and Administered by EMI APRIL MUSIC INC. (ASCAP) All Rights Reserved. International Copyright Secured. Used By Permission. |
| 504298 | 1503G | WORK IN PROGRESS | Alan Jackson | EMI APRIL MUSIC INC. | 100% | $150.00 | $225.00 | "Work In Progress" By Alan Jackson (c) 2002 EMI APRIL MUSIC INC. and TRI-ANGELS MUSIC All rights controlled and administered by EMI APRIL MUSIC INC. (ASCAP) All rights reserved. International copyright secured. Used by permission. |
| 517261 | 1503G | NINETEEN SOMETHIN' | D. Lee / C. Dubois | EMI APRIL MUSIC INC. | 50% | $75.00 | $112.50 | "19 SOMETHIN'" By Chris Dubois and David Lee (c) 2002 EMI APRIL M INC, SEA GAYLE MUSIC, CAREERS-BMG MUSIC PUBLISHING, INC. All Rights for SEA GAYLE MUSIC Controlled and Administered by EMI APRIL MUSIC INC (ASCAP) All Rights Reserved. International Copyright Secured. Used By Permission. |
| | | | | | Totals | $300.00 | $450.00 | |

Page 1